IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| BANKERS LIFE AND CASUALTY CO., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | NO. 3:21-cv-00247 |
| | ) | JUDGE RICHARDSON |
| CHRISTIAN MCDANIEL, MATTHEW | ) | |
| DALTON ADKINS, and PETER GORE, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION CONCERNING
## MOTION FOR TEMPORARY RESTRAINING ORDER

Pending before the Court is Plaintiff's Motion for Temporary Restraining Order and Preliminary Injunction (Doc. No. 7, "Motion"), along with a Memorandum in support thereof (Doc. No. 8). Also filed in this action is Plaintiff's Verified Complaint (Doc. No. 1), with attachments including certain of Plaintiff's contract agreements with Defendants. (Doc. No. 1-1 through 1-9).

### BACKGROUND[1]

Plaintiff is in the business of providing various insurance and financial products to customers. (Doc. No. 1 at ¶ 13). Defendants are former employees of Plaintiff who have recently resigned from their positions with Plaintiff. (*Id.* at ¶¶ 25, 31, and 35). As employees of Plaintiff, Defendants were given access to confidential and trade secret information, including customer

---

[1] The facts stated herein are taken from the Verified Complaint and attachments thereto. The Court credits them for the limited purposes of the Motion, inasmuch as they are internally consistent, not inherently incredible in any way, and adequately supported by documents (the authenticity of which the Court does not currently have reason to question) attached to the Verified Complaint.

lists, policyholder cards, and contact data (including names, addresses, dates of birth, social security numbers, and information specific to each of the customers' insurances policies). (*Id.* at ¶ 14).

Each of the Defendants entered into a contract with Plaintiff (titled "Bankers Life and Casualty Company Agent Agreement", hereinafter, "Agent Agreement") that included an agreement to: (1) use Plaintiff's Confidential Information[2] solely for the purposes of Agent Services with Plaintiff; (2) not, directly or indirectly, use, disseminate, disclose, or reveal any Confidential Information to another person, except as provided under the Agreement; (3) otherwise to treat and maintain in full confidence all Confidential Information; and (4) return all such information (including copies) to Plaintiff immediately upon termination of the Agreement, regardless of the format of such information. (Doc. Nos. 1-4 at 10; 1-5 at 10; 1-6 at 10).

In addition, the contracts between Plaintiff and Defendants provide that upon termination of the Agreements, Defendants shall promptly return to Plaintiff "any and all literature, forms, manuals, supplies, lists, contact data, policyholder lists, PPI [(personally identifiable information)] and other written, printed, or electronic information in any way pertaining to the business of" Plaintiff. (Doc. Nos. 1-4 at 8; 1-5 at 8; 1-6 at 8).

Defendants also executed Data Privacy and Security Agreements with Plaintiffs, as addenda to their contracts. (Doc. Nos. 1-7, 1-8, and 1-9). Those Data Privacy and Security Agreements provide that within five days of termination of the Agreements for any reason, Defendants will return to Plaintiff, or at Plaintiff's direction will destroy, "all PPI [personally

---

[2] "Confidential Information" is defined in the Agreements to include all information of Plaintiff, the unauthorized disclosure of which could be detrimental to the interests of the Company. (*See, e.g.,* Doc. No. 1-4 at 10).

identifiable information], including copies thereof," created or received on behalf of or received from Plaintiff that Defendants maintained "in any form, recorded on any medium, or stored in any storage system." (Doc. Nos. 1-7 at 6, 1-8 at 6, and 1-9 at 6).

Defendant McDaniel resigned as an employee of Plaintiff on March 1, 2021. (Doc. No. 1 at ¶ 25). On the day of his resignation, McDaniel downloaded information about every current and former policyholder serviced by Plaintiff's Brentwood, Tennessee office. (*Id.* at ¶ 26). Such downloading is reflected in a copy of McDaniel's "Download Report" attached to the Verified Complaint. (Doc. No. 1-10). McDaniel also removed multiple items from the Brentwood office, including customer leads, fact finders, and file cabinets containing policyholder information. (Doc. No. 1 at ¶ 28). McDaniel did not respond to Plaintiff's request that he return all such information, his office keys, and his security card. (*Id.* at ¶ 29). McDaniel has joined American Senior Benefits ("ASB"), which is a direct competitor of Plaintiff's. (*Id.* at ¶ 30).

Defendant Adkins resigned as an employee of Plaintiff on March 4, 2021 after speaking with the Regional Manager at ASB. (*Id.* at ¶ 31). Three days before his resignation, Adkins downloaded 129 documents containing information about current and former policyholders. (*Id.* at ¶ 33 and Doc. No. 1-11). On March 15, 2021, Defendant Gore resigned his position with Plaintiff and stated that he was joining ASB. (Doc. No. 1 at ¶¶ 35-36). Gore also downloaded documents about current and former policyholders before he resigned. (*Id.* at ¶ 38 and Doc. No. 1-12).

The Verified Complaint asserts causes of action for: Count I – breach of contract against McDaniel; Count II – breach of contract against Adkins; Count III – breach of contract against Gore; Count IV – misappropriation of trade secrets under federal law against all Defendants; and Count V – misappropriation of trade secrets under state law against all Defendants. (Doc. No. 1). The Motion asks the Court (as detailed more fully below) to order Defendants to: (1) return all

3

copies of Plaintiff's confidential information, including policyholder information; (2) identify in a signed declaration all third parties with whom they have shared such information and what information was shared; (3) submit all electronic storage devices they have used since January 1, 2021, for a computer forensic inspection to confirm deletion of all such information, and (4) temporarily cease and desist from using any such information. (Doc. No. 7 at 2).

Plaintiff has, within each Agent Agreement, an agreement with the respective Defendants to arbitrate disputes except requests for emergency injunctive relief such as that sought in the Motion. (Doc. No. 1 at ¶ 4). Thus, this action is limited to Plaintiff's request for emergency injunctive relief and the recovery of attorneys' fees and costs associated therewith. The Court concludes that such an action is permissible inasmuch as each of the (substantively identical) Agent Agreements contains the following language at subparagraph 7.1: " Either Party may file in a court of competent jurisdiction a claim for temporary, preliminary or emergency injunctive relief solely to preserve the status quo prior to and/or in aid of arbitration." (Doc. Nos. 1-1 at 5; 1-2 at 5; 1-3 at 5). Implicit in this subparagraph, however, is a significant limitation: such relief can be sought in court only to the extent that it would "preserve the status quo" pending (*i.e.*, "prior to and/or in aid of") arbitration. This Court will honor to this limitation.

**TEMPORARY RESTRAINING ORDER STANDARD**

In determining whether to issue a TRO pursuant to Rule 65 of the Federal Rules of Civil Procedure, the Court is to consider: (1) the plaintiff's likelihood of success on the merits; (2) whether the plaintiff may suffer irreparable harm absent the injunction; (3) whether granting the injunction will cause substantial harm to others; and (4) the impact of the injunction on the public interest. *Abney v. Amgen, Inc*., 443 F.3d 540, 546 (6th Cir. 2006). When determining whether to issue a TRO, a threat of immediate, irreparable harm must be present. Fed. R. Civ. P. 65(b)(1)(A)

(requiring a court to examine, on application for a TRO, whether "specific facts in an affidavit or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant"). *Cunningham v. First Class Vacations, Inc.,* No. 3:16-CV-2285, 2019 WL 1306214, at *1 (M.D. Tenn. Jan. 11, 2019).[3]

Courts sometimes describe this inquiry as a balancing test. *See, e.g.*, *Certified Restoration Dry Cleaning Network, L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007); *In re Eagle-Picher Indus., Inc.*, 963 F.2d 855, 859 (6th Cir. 1992). And that's true, to an extent; district courts weigh the strength of the four factors against one another. But even the strongest showing on the other three factors cannot "eliminate the irreparable harm requirement." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982). That is why the Sixth Circuit has held that a district court abuses its discretion "when it grants a preliminary injunction without making specific findings of irreparable injury[.]" *Friendship Materials*, 679 F.2d at 105. Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory. *D.T. v. Sumner Cty. Schools,* 942 F.3d 324, 326-27 (6th Cir. 2019).

---

[3] Alternatively, the Sixth Circuit permits a district court, in its discretion, to grant a preliminary injunction or temporary restraining order "even where the plaintiff fails to show a strong or substantial probability of ultimate success on the merits of his claim, but where he at least shows serious questions going to the merits and irreparable harm which decidedly outweighs any potential harm to the defendant if an injunction is issued." *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982). The Court is aware that confusion was created when language in some cases appeared to state that a "balance of hardships" test was an alternative to the traditional irreparable harm test for injunctive relief. *Friendship Materials,* 679 F.2d at 104. The balance of hardships test, however, does not eliminate the irreparable harm requirement.

## ANALYSIS OF TRO FACTORS

A. <u>Likelihood of Success on the Merits</u>

Plaintiff supports its argument that it is likely to succeed on the merits of its breach of contract claims with evidence of signed contracts with Defendants that prohibit Defendants from taking or disclosing Plaintiff's confidential information, including personal information about Plaintiff's customers and policyholders. Those contracts also require Defendants to return any such confidential information to Plaintiff at the termination of the contracts. Plaintiffs have also supported their claims with evidence that Defendants, in fact, downloaded and took, without authorization, Plaintiff's confidential information with them when they left Plaintiff's employ.

Plaintiff also contends that it will succeed on its misappropriation of trade secret claims because it can show that its confidential information included "trade secrets"[4] and Defendants "misappropriated"[5] that information. Plaintiff has asserted that the information downloaded and taken by Defendants included customer lists that were otherwise not readily ascertainable, customer information that included health information, policy specifications, coverage levels, and

---

[4] Under 18 U.S.C. § 1839(3), "trade secret" includes all forms and types of financial, business, scientific, technical, economic, or engineering information that the owner thereof has taken reasonable measures to keep secret and that derives independent economic value from not being generally known or readily ascertainable. Similarly, under Tennessee law, to be a "trade secret," the information must derive independent economic value from not being generally known, others could obtain economic value from its disclosure or use, and efforts have been made to maintain its secrecy. *I Love Juice Bar Franchising, LLC v. ILJB Charlotte Juice, LLC,* No. 3:19-cv-0981, 2019 WL 6050283, at *6 (M.D. Tenn. Nov. 15, 2019).

[5] "Misappropriation" means acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means; or disclosure or use of a trade secret of another without express or implied consent. 18 U.S.C. § 1839(5); Tenn. Code Ann. § 47-25-1702(2). Given the provisions of Plaintiff's various agreements with each Defendant, which impose strict limitations on Defendants' use and disclosure of the confidential information, a finding of "misappropriation" is likely.

6

premiums, customer information that included contact information, social security numbers, and dates of birth. Moreover, Plaintiff has presented evidence that Defendants misappropriated this information, without authority, by improper means. Plaintiff has shown a likelihood of success on the merits of the trade secrets claims.

B. Irreparable harm

When determining whether to issue a TRO, a threat of an *immediate*, irreparable harm must be present. Fed. R. Civ. P. 65(b)(1)(A) (requiring a court to examine, on application for a TRO, whether "specific facts in an affidavit or a verified complaint clearly show that *immediate* and irreparable injury, loss, or damage will result to the movant") (emphasis added); *see also Appliancesmart, Inc. v. Dematteo*, No. 2:18-CV-1729, 2018 WL 6727094, at *2 (S.D. Ohio Dec. 21, 2018) ("[A]lthough some courts would examine the four factors required for issuance of a preliminary injunction, a focus on the irreparability and immediacy of harm is all that is required." (internal quotation marks and citation omitted)); *Hacker v. Fed. Bureau of Prisons*, 450 F. Supp. 2d 705, 710 (E.D. Mich. 2006) ("A temporary restraining order is an extraordinary remedy that generally is reserved for emergent situations in which a party may suffer irreparable harm during the time required to give notice to the opposite party or where notice itself may precipitate the harm."). In sum, a TRO may be issued only where the harm to plaintiffs is both irreparable *and* immediate. *Bumpus v. Howard,* No. 3:19-cv-01081, 2021 WL 949319, at *2 (M.D. Tenn. Mar. 12, 2021).

Plaintiff seeks basically a preservation of the status quo until its Motion for Preliminary Injunction can be heard. It asks the Court to enjoin Defendants from misappropriating Plaintiff's confidential information. Plaintiff alleges that its confidential information includes information needed to target policyholders, tailor proposals to specific insurance products and premium costs,

7

and induce those policyholders to cancel their policies with Plaintiff. (Doc. No. 8 at 9). Plaintiff asserts that it stands to suffer "a loss of existing and/or potential customers, goodwill, and other business which cannot be fully quantified." (*Id.* at 10). Thus, Plaintiff has showed that it would suffer irreparable harm if Defendants are not enjoined from using its trade secret information.

### C. Balance of Harms

Plaintiff asserts that the irreparable harm posed to it, as described above, outweighs any potential harm to Defendants in not being able to continue to violate their contractual obligations with respect to Plaintiff's confidential information. Given Plaintiff's likelihood of success on the merits and the tailored scope of the TRO that will be issued, Defendants will be enjoined only from doing things they likely should not be doing anyway. Defendants would not likely be much harmed by short-term cessation of activities in which they likely should not be engaged anyway. On the other hand, Plaintiff could be substantially harmed by short-term *continuation* of such activities, because even short-term engagement in such activities incrementally increases the risk that the proverbial cat (metaphorically, Plaintiff's confidential information) will get out of the proverbial bag, headed to parts unknown where it is available to others to the detriment of Plaintiff. Thus, the Court agrees that the balance of harms weighs in favor of granting injunctive relief (to at least some extent) in the form of an appropriately tailored TRO.

### D. Impact on the Public Interest

Plaintiff contends there is no harm to the public in granting the injunctive relief it requests. The Court agrees. To begin with, this is at heart a private dispute, and the public has no particular stake in the outcome, *i.e.*, who wins and loses. The public does have an interest in certain imperatives implicated by the dispute, however, such as the sanctity of contracts and the protection

8

Case 3:21-cv-00247   Document 14   Filed 03/26/21   Page 8 of 13 PageID #: 237

of trade secrets. Given Plaintiff's likelihood of success on the merits of claims that would vindicate these interests, the public interest is in favor of a TRO.

## APPROPRIATE SCOPE OF TRO

In the proposed TRO (Doc. No. 7-1) filed together with the Motion, Plaintiff asks for the TRO to include the following substantive provisions:

    a) Defendants McDaniel, Adkins and Gore are ordered to return all copies of Bankers Life confidential information, including policyholder information, each Defendant has in his possession, and/or removed or copied from Bankers Life, and any documents or summaries containing such information, within three business days of the date of this Order;

    b) Defendants McDaniel, Adkins and Gore are ordered to submit individual, signed declarations, identifying all third parties with whom the Defendants shared copies of Bankers Life confidential information, including policyholder information, each Defendant possessed, removed or copied from Bankers Life, and any documents or summaries containing such information, within three (3) business days of the date of this Order;

    c) Defendants McDaniel, Adkins and Gore are ordered to submit all electronic storage devices they have used since January 1, 2021, to a computer forensic expert selected by Bankers Life to confirm whether there are copies of Bankers Life confidential information, including policyholder information, each Defendant possessed, removed or copied from Bankers Life, and documents or summaries containing such information on the device, and if such information is on the device, to confirm deletion of said information, within three business days of the identification of them by Bankers Life of such a vendor; [and]

    d) Defendants McDaniel, Adkins and Gore are prohibited from using copies of Bankers Life confidential information, including policyholder information, each Defendant removed or copied from Bankers Life, and any documents or summaries containing such information, from the date of this Order through the preliminary injunction hearing in this matter[.]

(Doc. No. 7-1 at 1-2).

In the Court's view, the scope of the requested TRO is manifestly too broad. As indicated above, Plaintiff is contractually obligated not to seek a TRO for any purpose other than to preserve

9

the status quo, and thus it would be inappropriate for this Court, in the exercise of its discretion, to order a TRO that goes beyond this purpose. The Court fully realizes that what constitutes the "status quo" often is in the eye of the beholder; what a movant can reasonably characterize as a (proposed) TRO that would merely "keep things the same" can often reasonably be characterized by the opposing side as one that would change things diametrically. Still, the Court is called upon to give a reasonable construction to the term "status quo" as used in the parties' agreement. And whatever it means, it must mean something much narrower that what Plaintiff is asking the Court to order in paragraphs (a)-(c) above. Requiring Defendants to proactively do this, that and the other thing—including creating and swearing to declarations and turning over various items in their possession—stretches the concept of the "status quo" beyond the breaking point, and so the Court declines to order it. *See API Tech. Servs., LLC v. Francis*, No. 4:13CV142, 2013 WL 12131381, at *4 (E.D. Va. Dec. 4, 2013) (noting that the purpose of a TRO is to preserve the status quo and explaining that "ordering [d]efendants to return [the plaintiff's] purported trade secrets would not maintain the status quo, but would instead serve to alter the positions of the parties"). On the other hand, paragraph (d) fits very comfortably within traditional notions of the "status quo," and so the Court will order it—and indeed will order it with more expansive prohibitions than suggested by Plaintiff in paragraph (d).

For Plaintiff, there is a silver lining to the cloud of obtaining a narrower TRO than the one it asked for. Specifically, as discussed below, given the TRO actually being issued, the Court will waive the bond, which it would not have done had it issued the broader TRO requested by Plaintiff. The reason is that there absolutely could have been non-negligible costs for Defendants to comply with the TRO Plaintiff requested (unlike the TRO the Court actually is issuing). And it appears that costs of complying with (though not costs of *litigation concerning*) a TRO that turns out to be

wrongfully issued are recoverable. *See, e.g.*, *Smart Study Co. v. Bichha123*, No. 20-CV-7889 (JSR), 2020 WL 7137338, at *4 (S.D.N.Y. Dec. 7, 2020). And the Court absolutely would have required a bond sufficient to reimburse Defendants for an amount reasonably estimated to be the cost of compliance with the broader TRO requested by Plaintiff.

## WAIVER OF BOND REQUIREMENT

In its proposed TRO filed, Plaintiff included the following (proposed) language: "Plaintiff's requirement to set a bond is hereby waived." (Doc. No. 7-1 at 2). Understanding that under Sixth Circuit case law, the Court in its discretion could waive the seemingly absolute prerequisite to a TRO that Plaintiff post a bond ("security") "in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained," Fed. R. Civ. P. 65(c), the Court ordered Plaintiff to file an explanation as to why the Court should exercise its discretion to waive the bond requirement. (Doc. No. 11). Plaintiff did so, advancing two reasons why the Court should do so:

> Bankers Life respectfully requests that the Court waive the bond requirement in this case because the Defendants are unlikely to sustain any costs or damages whatsoever as the result of an injunction. Bankers Life is not trying to prevent Defendants from working in the insurance industry or from otherwise earning a living; it only asks that Defendants refrain from using trade secrets that they misappropriated from Bankers Life. Furthermore, the possibility of a wrongful injunction is low, given the likelihood that Bankers Life will prevail on its claims. As explained in the Verified Complaint and accompanying exhibits, Bankers Life has put forth ample evidence to support its claims for breach of contract and misappropriation of trade secrets.

(Doc. No. 12 at 1). The Court disregards Plaintiff's second reason; the allegedly low risk of a wrongful injunction (or here, more specifically, TRO) actually is not relevant, because under the plain language of Rule 65(c) the question of whether (and the amount of) a bond should be required is addressed assuming *arguendo* that the injunction would prove to have been wrongful. But the

11

first reason, though presented in only barebones fashion, is meritorious. Given the limited scope of the TRO ordered by the Court, damages to Defendants from any wrongful injunction would be minimal, and costs of compliance with the TRO (which, as noted above, are recoverable in the event of a wrongful injunction) should be virtually non-existent. Under such circumstances, waiver of the bond requirement is appropriate. *See W S Int'l, LLC v. M. Simon Zook, Co.,* 566 F. App'x 192, 197 (3d Cir. 2014) (recognizing a narrow exception to the bond requirement when compliance with the injunction raises no risk of monetary loss to the defendant).

## CONCLUSION

For all these reasons, Plaintiff's Motion for Temporary Restraining Order will be granted in part via a separate Temporary Restraining Order wherein the Court order will order the following relief:

> Defendants McDaniel, Adkins, and Gore are hereby enjoined from using, copying, transferring, reviewing, or disclosing to any other person or entity any of Plaintiff's confidential information—in whatever physical or electronic form and whether considered original" or a copy—including policy holder information, for any purpose from the date of this Order through the preliminary injunction hearing in this matter.

A hearing to consider Plaintiff's Motion for Preliminary Injunction will be set for **March 31, 2021, at 9:00 a.m.** Absent extraordinary circumstances, the hearing will conclude on that day.

The parties shall file with the Court by noon on March 30, 2021, the following pertaining to the preliminary injunction hearing: (1) any affidavits; (2) witness lists; (3) exhibit lists; (4) any depositions and/or deposition designations; (5) any stipulations; (6) any motions in limine; and (7) any supplemental briefs. No witness shall testify live at the preliminary injunction hearing unless the party calling such witness to testify has identified and made that witness available for a deposition prior to the hearing.

Plaintiff's request for expedited discovery is referred to the Magistrate Judge for decision. The Court notes that to the extent that Plaintiff may be chagrined that it will be unable to obtain discovery it believes it needs for purposes of the preliminary injunction hearing prior to the hearing taking place next week, there is nothing the Court can do about that. Plaintiff chose to proceed with a motion for a TRO without notice to Defendants, and if a TRO is issued without notice, then a motion for a preliminary injunction "must be set for hearing at the earliest possible time, taking precedent over all other matters except hearings on older matters of the same character."[6] Fed. R. Civ. P. 65 (b)(3). Thus, the Court is constrained to set the hearing at a date likely far too early for Plaintiff to obtain discovery meaningfully in advance of the hearing.

Although the Court has opined herein that Plaintiff is likely to succeed on the merits, it realizes that this view is merely preliminary and based on the current record and that Plaintiff may or may not ultimately succeed on the merits.

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

[6] Plaintiff did mention efforts to provide Defendants with notice of the Motion, *i.e.*, by sending it (and other filings) to Defendants' last known address and to Adkins' personal email address, and by attempting to find the other Defendants' email addresses. But the Court cannot in any way be confident that any Defendant actually received notice, and thus it treats the TRO as without notice.